UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 26 -CR - 20035-WILLIAMS

UNITED STATES OF AMERICA

v.

TOMAS NIEMBRO CONCHA,

Defendant.
_____/

### FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA

The United States Attorney's Office for the Southern District of Florida and the United States Department of Justice, Criminal Division, Money Laundering, Narcotics, and Forfeiture Section (collectively, the "Government" or the "United States") and Tomás Niembro Concha (hereinafter referred to as the "defendant" or "Niembro") stipulate and agree that the information stated herein is true and accurate and a sufficient basis for the defendant's plea of guilty to (1) conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; and (2) conspiracy to violate the International Emergency Economic Powers Act in violation of 50 U.S.C. § 1705(c). Had this matter proceeded to trial, the defendant stipulates and agrees that the Government would have proved the facts alleged below beyond a reasonable doubt:

### Relevant Entities and Individuals

1.      Nodus International Bank ("Nodus" or the "Bank") is an International Banking Entity organized under the laws of Puerto Rico. It is regulated by the Puerto Rican Office of the Commissioner of Financial Institutions (Spanish acronym "OCIF") and began operations on or about February 22, 2010.

2.      Niembro was a co-owner of Nodus, served as the Bank's president and chief

executive officer, and was a member of the Bank's board of directors.

3. Juan Francisco Ramirez ("Ramirez") co-owned Nodus with Niembro and served as chairman of the Bank's board of directors.

4. Niembro and Ramirez bought Nodus in or around May 2017. In October 2023, OCIF placed Nodus in receivership and revoked its license.

5. Emilio Santandreu ("Santandreu") is the owner and chief executive officer of Our Microlending, a Miami-based microfinance institution.

6. Nodus Finance LLC ("Nodus Finance") is a Miami-based finance company co-owned by Niembro and Ramirez.

7. Jose Gregorio Suarez ("Suarez") was a member of Nodus's board of directors from May 2010 to July 2017 and from 2019 to October 2023. Suarez was also the general manager of Nodus Finance from 2013 to September 2024.

## The Our Microlending Fraud Scheme

8. Between 2017 and 2023, Niembro and Ramirez conspired with Santandreu to place more than $11 million of the Bank's funds in Our Microlending through the purchase of "certificates of investment" so that Our Microlending could loan those funds to Niembro and Ramirez for their own benefit.

9. Puerto Rican law prohibits international banking entities from issuing loans to shareholders, directors, officers, or employees, except when previously authorized in writing by OCIF. Niembro and Ramirez knew that OCIF would not have approved multi-million-dollar loans to themselves from Nodus had they requested authorization. Knowing this, Niembro and Ramirez devised a scheme with Santandreu to secure loans from the Bank for their benefit without regulatory approval by having the Bank make sham investments in Our Microlending.

2

10.     Niembro and Ramirez concealed from Nodus's comptroller (the "Comptroller") the fact that the Bank's investments in Our Microlending were actually personal loans to Niembro and Ramirez, because they knew their scheme was illegal and, had the Comptroller known, he would have objected to the investments and notified OCIF. Niembro and Ramirez also caused the Comptroller to make affirmative misrepresentations to OCIF. In certain cases, the Comptroller was obligated to notify OCIF of the investments because they exceeded 25% of Nodus's net capital— one of many regulatory thresholds designed to ensure the Bank's safety and soundness. But OCIF was not made aware that the investments were, in reality, loans to Niembro and Ramirez. All investments were also reflected in the Bank's balance sheet, which the Bank was obligated to share with OCIF on a quarterly basis.

11.     Further, Niembro and Ramirez fraudulently induced the Bank's board of directors to invest in Our Microlending by concealing from one or more of the Bank's voting board members that the investments were in fact intended to fund personal loans to Niembro and Ramirez. All investments in Our Microlending were approved by unanimous board resolutions, as required by the Bank's Investment Policy. However, none of the resolutions notified the board that the proposed investments were a front for personal loans to Niembro or Ramirez.

### The 2017 Transaction

12.     On or about August 16, 2017, Niembro, Ramirez, and Santandreu executed the following transaction: (i) Niembro and Ramirez caused Nodus to buy a certificate of investment for $2.5 million from Our Microlending, effectively loaning those funds to Our Microlending; and (ii) Our Microlending used the funds it obtained from Nodus to issue a loan to Ramirez for $2,050,000. Nodus wired $2.5 million from its account in New York to Our Microlending's account in Florida. At Ramirez's request, Our Microlending disbursed Ramirez's $2,050,000 loan

to an associate's account in Switzerland to repay a loan that Ramirez had procured to partially finance his purchase of Nodus in May 2017.

13. In or about August 2019, Niembro and Ramirez pledged Nodus assets held at Entity 1 in the United Kingdom to obtain two loans from Entity 1 totaling $1.7 million to partially repay Ramirez's personal loan with Our Microlending. On September 10, 2019, Ramirez used these funds to wire $1,230,000 to Our Microlending toward his $2.05 million loan, leaving $850,000 in principal outstanding. On September 11, 2019, only after Our Microlending received payment from Ramirez, Our Microlending transferred $1.5 million in principal and approximately $58,000 in interest to Nodus in partial repayment of the Bank's $2.5 million investment certificate. Because Ramirez could not repay the entire balance of his loan with Our Microlending, Niembro and Ramirez caused Nodus to renew the investment certificate for $1 million through September 2020.

14. In September 2020, Ramirez paid off his personal loan with Our Microlending, this time with Nodus funds routed through Nodus Finance. On September 16, 2020, Niembro and Ramirez caused Nodus to purchase a promissory note from Nodus Finance for $1.5 million, effectively loaning those funds to Nodus Finance. On September 17, 2020, Nodus Finance wired $866,045.32 directly to Our Microlending to pay off Ramirez's loan balance, and the next day, Our Microlending repaid the $1 million investment certificate to Nodus. Niembro and Ramirez concealed from the Comptroller that the $1.5 million promissory note investment in Nodus Finance was a sham investment intended to obtain Bank funds to pay off Ramirez's personal loan with Our Microlending and pay interest on other fraudulent loans. Niembro and Ramirez caused Nodus Finance to record this transaction as a loan in the name of a relative of Ramirez's wife who acted as a straw borrower. The promissory note for $1.5 million was never repaid to the Bank.

***The 2018 Transaction***

15.     In late November 2018, Niembro and Ramirez approached Santandreu to procure a $1.4 million loan from Our Microlending to Niembro. In exchange, Niembro and Ramirez agreed to cause Nodus to purchase an investment certificate from Our Microlending for $1.7 million. On November 28, 2018, Nodus wired $1.7 million from its account in New York to Our Microlending's account in Florida. The following day, Our Microlending wired $1,386,000 in loan proceeds to Niembro. Niembro repaid his personal loan with Our Microlending in June 2019, upon which Our Microlending paid off the certificate of investment for $1.7 million owed to the Bank.

***The 2022 Transaction***

16.     In or about March 2022, Niembro and Ramirez schemed with Santandreu to fraudulently procure a loan for more than $6 million from the Bank. Between April 12 and 13, 2022, Niembro and Ramirez caused Nodus to wire $7 million from its account in New York to Our Microlending's account in Florida as part of the Bank's purchase of two certificates of investment from Our Microlending. In turn, Santandreu caused Our Microlending to loan $6.4 million to Niembro and Ramirez. Specifically, Our Microlending loaned $3,685,760 to a shell company owned by Niembro and his wife and directly loaned Ramirez and his wife $2,714,240.

17.     Niembro and Ramirez used the loan proceeds that they fraudulently obtained from Nodus to make "capital contributions" to Nodus to satisfy a commitment they made in the capitalization plan submitted to OCIF in March 2022. On April 21, 2022, Niembro made a capital injection of $1 million using the fraud proceeds, and on April 22, 2022, Ramirez similarly made a capital infusion of $890,000 to Nodus. Neither Niembro nor Ramirez informed the rest of the board or the Comptroller that their capital contributions were proceeds of loans they had obtained from the Bank through sham transactions with Our Microlending.

18. On or about April 18 and 19, 2022, Niembro and Ramirez also transferred approximately $2.76 million and $1.5 million, respectively, to Entity 3, a Miami-based mortgage company, within a few days of receiving the loan proceeds from Our Microlending. And just a few days later, between April 22 and April 29, 2022, out of the $4.26 million that Entity 3 received from Niembro and Ramirez, Entity 3 sent approximately $3.86 million to Nodus in five separate payments to satisfy Entity 3's outstanding promissory notes with the Bank. A few years before, in or about mid-2017, Niembro and Ramirez had unlawfully obtained approximately $4 million from the Bank by causing Nodus to purchase promissory notes from Entity 3 and having Entity 3 loan those funds to them. Given OCIF's scrutiny and criticism of the Entity 3 promissory notes during the Bank's ongoing regulatory examination, which had begun in January 2022, Niembro and Ramirez wanted to clear the Entity 3 debt from the Bank's books to avoid detection of their past illegal scheme.

19. Niembro made two repayments to Our Microlending using a Florida-based cryptocurrency company, Entity 2, in an effort to obfuscate the illicit source of the funds: $2,425,000 on March 29, 2023, and $363,750 on May 15, 2023, totaling $2,788,750. Niembro caused cryptocurrency to be transferred to Entity 2, and at Niembro's request, Entity 2 then converted the cryptocurrency to fiat currency and transferred the equivalent in U.S. dollars to Our Microlending. These funds were the proceeds from the sale of shares Niembro owned in a Venezuelan supermarket chain, which he had purchased using funds fraudulently obtained from Nodus. When Our Microlending's Florida-based bank inquired why Entity 2 was making these high-value payments to Our Microlending, Niembro caused fabricated documents substantiating a business relationship between him and Entity 2 to be submitted to Our Microlending's bank.

20. To date, Our Microlending owes $2,680,000 to the Bank in connection with the

certificates of investment for $7 million. Our Microlending has not fully repaid the Bank because Niembro and Ramirez have not completely repaid the parallel loans they obtained from Our Microlending.

### The Nodus Finance Fraud Scheme

21. Between in or about January 2018 and in or about September 2021, Niembro and Ramirez caused Nodus to purchase at least 47 promissory notes totaling approximately $25.3 million from Nodus Finance without authorization from OCIF and without performing any repayment analysis. Given Niembro's and Ramirez's ownership of Nodus Finance, these transactions were considered financings to the Bank's shareholders, which are prohibited by Puerto Rican law without approval from OCIF.

22. The Bank's purchase of each promissory note from Nodus Finance required unanimous board approval. For each purchase, the Comptroller had to confirm that the Bank had sufficient liquidity to effect the purchase. If liquidity was available, the Comptroller completed the transaction by recording each promissory note in the Bank's books and authorizing the disbursement of the promissory note's proceeds into Nodus Finance's account held at Nodus.

23. Niembro and Ramirez told the Comptroller that the investments in Nodus Finance were part of the Bank's growth and expansion strategy in the U.S. market. In reality, however, several of the promissory notes that Niembro and Ramirez caused the Bank to purchase from Nodus Finance for millions of dollars during a multi-year period were part of an extensive fraudulent scheme through which Niembro and Ramirez siphoned funds from the Bank to enrich themselves. Specifically, Niembro and Ramirez fraudulently induced the Bank's board and the Comptroller to agree to, or facilitate, the purchase of promissory notes from Nodus Finance based on omissions of material information—namely, the fact that they were using the proceeds of the

7

notes for their own benefit, including to make personal investments in third-party companies, pay personal mortgages, or cover personal credit card expenses, among other purposes.

24.     Below are examples of promissory notes that Niembro and Ramirez fraudulently caused the Bank to purchase from Nodus Finance, the proceeds of which they used, at least in part, to enrich themselves:

### The Entity 4 Transactions

25.     On January 18, 2018, Niembro and Ramirez caused Nodus to buy a $2 million promissory note from Nodus Finance so that Nodus Finance could issue a loan in the name of Entity 4. In fact, Niembro and Ramirez did not use these funds to finance a loan to Entity 4 but rather to make personal investments in Venezuelan companies and buy Nodus preferred shares.

26.     On December 12, 2019, Niembro and Ramirez caused Nodus to buy at least two additional promissory notes from Nodus Finance purportedly to finance loans to Entity 4 but in fact used those funds to make interest payments due on other fraudulent loans they obtained from Nodus and transferred the remainder to their personal bank accounts: (a) a $442,000 promissory note that was split between Niembro and Ramirez and (b) a $625,000 promissory note exclusively used by Niembro for his benefit.

### The Entity 5 Transactions

27.     On February 6, 2018, Niembro and Ramirez caused Nodus to buy a $1.5 million promissory note from Nodus Finance so that Nodus Finance could issue a loan in the name of Entity 5, an oil and gas company in Texas. In fact, these funds were used for Niembro's and Ramirez's benefit, particularly: (a) to make personal investments in Entity 5 in the amount of $1,187,500, which Niembro and Ramirez structured as a loan from Nodus Finance to Entity 5 to

conceal the illicit nature of the transaction; and (b) to make interest payments due on other fraudulent loans.

28.     On December 12, 2019, Niembro and Ramirez caused Nodus to buy a $438,000 promissory note from Nodus Finance so that Nodus Finance could issue a loan in the name of Entity 5. In fact, Niembro and Ramirez used these funds to make interest payments on other fraudulent loans.

### The Entity 6 and Entity 7 Transactions

29.     On September 11, 2020, Niembro caused Nodus to buy two promissory notes from Nodus Finance to finance loans to Entities 6 and 7—Venezuelan real estate and construction companies owned by a close Niembro associate: one for $1,800,000 and another for $1,900,000. In fact, these funds were used to finance a loan from that associate to Niembro for $3,100,000, the proceeds of which Niembro received in a Barbados bank account held in the name of one of his shell companies.

30.     On October 12, 2021, Niembro caused Nodus to buy a $380,000 promissory note from Nodus Finance, purportedly to fund a loan to Entity 6. In fact, Niembro used these proceeds to pay interest due on the $1,800,000 and $1,900,000 fraudulent loans he obtained in the names of Entities 5 and 6, and to pay his personal income taxes.

31.     Another of Niembro's close associates, Individual 2, was a frequent straw borrower for Niembro. On February 6, 2020, Niembro caused Nodus to buy a $760,000 promissory note from Nodus Finance for a purported loan to Entity 7. However, that same day, Nodus Finance transferred $548,855 of these funds to Individual 2. Individual 2 then transferred $341,500 to Niembro on February 11, 2020, and $205,000 to Nodus to pay interest on other fraudulent loans on February 13, 2020. Nodus Finance subsequently transferred $182,330.73 to Individual 2 on

9

June 1, 2020, and Individual 2 transferred $120,000 to Niembro on June 15, 2020. As of April 2023, the $760,000 promissory note had a balance of $570,000.

32.     On December 10, 2020, Niembro induced Nodus to purchase a $200,000 promissory note from Nodus Finance for a purported loan to Entity 6, but Nodus Finance actually disbursed the funds to Individual 2 for Niembro's benefit.

33.     On May 14, 2021, Niembro caused Nodus to purchase a $250,000 promissory note from Nodus Finance purportedly to finance a loan to Entity 6. However, Nodus Finance disbursed these funds to Individual 2, who then transferred a total of $235,000 to Niembro in five separate transactions during a 10-day period.

### *The Entity 8 and Individual 3 Transactions*

34.     On March 23, 2018, Niembro and Ramirez caused Nodus to purchase a $1 million promissory note from Nodus Finance purportedly to finance a loan to a client, but the funds were actually used for Niembro's and Ramirez's benefit. On January 11, 2021, Individual 3 agreed to assume this loan as a straw borrower in exchange for Niembro and Ramirez causing Nodus to grant a loan to Individual 3's company. As of April 2023, the promissory note had a balance of $768,353.58.

35.     On September 13, 2021, Niembro caused Nodus to purchase a $2.1 million promissory note from Nodus Finance purportedly to fund a loan to Entity 8, a shell company owned by Individual 3. In fact, Niembro used these funds to make personal investments and pay interest on other fraudulent loans.

36.     On December 15, 2021, Niembro caused Nodus to purchase a $120,000 promissory note from Nodus Finance purportedly to fund a loan to Entity 8. However, Niembro used these funds to pay interest on the $2.1 million loan to Entity 8.

10

### *The Entity 9 Transactions*

37.     On May 14, 2021, and June 24, 2021, Niembro and Ramirez caused Nodus to purchase two $1 million promissory notes from Nodus Finance purportedly to finance loans to a Niembro associate, Individual 4. However, Niembro had agreed to facilitate this loan to Individual 4 for the sole purpose of having Individual 4 purchase $2 million in preferred shares of the Bank. To conceal this scheme from OCIF, Niembro and Ramirez later caused Nodus Finance to change the borrower of record for these loans from Individual 4 to Entity 9, a shell company.

### *Nodus's Purchase of the Nodus Finance Portfolio*

38.     On March 9, 2023, OCIF notified Nodus of its intention to place the Bank into liquidation, and between on or about March 24 and March 28, 2023, Niembro and Ramirez indicated their agreement, on behalf of the Bank, to enter into a voluntary liquidation.

39.     On April 28, 2023, knowing that the liquidation process would commence imminently and without authorization from OCIF, Niembro and Ramirez caused Nodus to enter into an agreement to purchase a loan portfolio from Nodus Finance for approximately $26 million. Niembro and Suarez executed the agreement on behalf of the Bank and Nodus Finance, respectively. Most of the loans in the portfolio were delinquent, nonperforming, and otherwise not secured by collateral. Niembro and Ramirez caused the Bank to accept the loan portfolio as payment of Nodus Finance's debt arising from the 47 promissory notes the Bank purchased between January 2018 and September 2021 for approximately $25.2 million. This resulted in a direct benefit to Nodus Finance (and Niembro and Ramirez) by freeing Nodus Finance of its debt to the Bank.

40.     The promissory notes, or portions thereof, that funded the disbursements for Niembro's and Ramirez's benefit described in paragraphs 25-37 above were never repaid to the

11

Bank and were among the 47 promissory notes that Niembro and Ramirez caused the Bank to extinguish in late April 2023.

### Fraudulent Loans Originated Directly by Nodus

41.     Niembro and Ramirez also fraudulently caused Nodus to directly originate loans for their own personal benefit.

#### *The Entity 4 Loan*

42.     On August 21, 2018, Niembro and Ramirez caused Nodus to fraudulently lend $937,500 to Entity 4. In fact, Niembro and Ramirez used these funds for personal investments in several Venezuelan companies, just as they did with the funds they fraudulently obtained from the Bank through Nodus Finance in the form of loans in Entity 4's name.

#### *The Entity 8 Loan*

43.     On November 14, 2018, Niembro and Ramirez caused Nodus to lend $2.5 million to Individual 5, the owner of a Colombian oil company, but represented to Individual 5 that these funds were an investment by Niembro and Ramirez in his company. In May 2020, after facing pressure from Individual 5 to remove his name from the loan if the proceeds were in fact intended to be an investment, Niembro and Ramirez caused Nodus to reissue the loan in the name of Entity 8, whose owner, Individual 3, had agreed with Niembro and Ramirez to serve as a straw borrower to facilitate the investment in the oil company. The shares that Niembro and Ramirez purchased in the oil company were titled in Entity 8's name.

### The Sanctions Evasion Scheme

44.     Between 2021 and 2023, Niembro conspired with others to conduct prohibited financial transactions with Individual 1 — a Venezuelan and Spanish national designated as a

12

Specifically Designated National by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") on January 19, 2021, for operating in the oil sector of the Venezuelan economy and materially assisting, sponsoring, or providing financial, material, or technological support for, or goods or services to or in support of PdVSA, a sanctioned entity.

45.  In January 2018, before Individual 1 was sanctioned, Nodus granted a loan to Individual 1's company for $3,234,422.69. This loan was collateralized by Individual 1's house in Southampton, NY. After OFAC designated Individual 1, Individual 1's company defaulted on its loan with Nodus, which gave the Bank the right to foreclose on Individual 1's Hamptons house.

46.  By June 2022, Niembro and Individual 1 devised a plan to circumvent U.S. sanctions against Individual 1 by which Individual 1 could satisfy his Nodus loan but retain ownership of his Hamptons house. Their scheme proceeded as follows:

a.  Individual 1 transferred ownership of his Hamptons house to Nodus via a "deed in lieu of foreclosure" settlement agreement to satisfy the balance of his loan with Nodus in the amount of $2,496,353.61. The house was valued at approximately $5.5 million at that time. This transfer of ownership was carried out pursuant to an OFAC license, which the Bank obtained with Niembro's knowledge and involvement.

b.  In parallel, Niembro and a co-conspirator entered into a "private" purchase option agreement with Entity 10 — a Florida LLC owned by two family members of Individual 1 — through which Entity 10 was granted the option to purchase the Hamptons house from the Bank for $4 million. Between approximately June and August 2022, Niembro and Individual 1 negotiated the terms of the option agreement, including the price for the sale of the Hamptons house to Entity 10. Niembro and Individual 1 knew that Entity 10 would act as a nominee buyer and that Individual 1 would be the ultimate beneficial owner of the house upon Entity 10's

purchase of the property. The option agreement conceived by Niembro and Individual 1 was not licensed by OFAC, and OFAC was not otherwise informed of their plan to transfer the Hamptons property to a front company for the ultimate benefit of Individual 1.

c. The deed in lieu of foreclosure settlement agreement and the separate purchase option agreement were executed in August 2022. Ownership of the Hamptons house was transferred to Nodus on April 26, 2023. On April 28, 2023, Entity 10 exercised its purchase option and began the process of re-purchasing the Hamptons house for the benefit of Individual 1.

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

Date: 3-19-26

By:

FELIPE PLECHAC-DIAZ
Assistant United States Attorney

MARGARET A. MOESER, CHIEF
CRIMINAL DIVISION, MONEY
LAUNDERING, NARCOTICS AND
FORFEITURE SECTION
U.S. Department of Justice

Date: 3-19-26

By:

JAVIER URBINA
SAMIR PAUL
Trial Attorneys

Date: 3|19|26

By:

MICHAEL NADLER
Counsel for defendant Tomas Niembro
Concha Jvan Micheleu For
Michael Nadler

14

Date: 3|19|26                          By: _____
                                            TOMAS NIEMBRO CONCHA
                                            Defendant